## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **STATE OF LOUISIANA** | * | **CASE NO.:** |
| **Plaintiff** | * | |
| | * | |
| **V.** | * | **JUDGE:** |
| | * | |
| **BP EXPLORATION & PRODUCTION,** | * | **MAGISTRATE:** |
| **INC.; BP CORPORATION NORTH** | * | |
| **AMERICA, INC.; BP AMERICA, INC.;** | * | |
| **BP P.L.C.; ANADARKO PETROLEUM** | * | |
| **CORPORATION; ANADARKO E&P** | * | |
| **COMPANY LP; TRANSOCEAN** | * | |
| **HOLDINGS LLC; TRITON ASSET** | * | |
| **LEASING GmbH; TRANSOCEAN** | * | |
| **DEEPWATER, INC.; TRANSOCEAN** | * | |
| **OFFSHORE DEEPWATER DRILLING,** | * | |
| **INC. AND MOEX OFFSHORE 2007 LLC** | | |
| **Defendants** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## COMPLAINT FOR PENALTIES AND DECLARATORY JUDGMENT

NOW INTO COURT, comes James D. "Buddy" Caldwell, Attorney General of the State of Louisiana, appearing herein on behalf of the State of Louisiana (Louisiana or "the State") who respectfully represents as follows:

## INTRODUCTION

1.

This civil action arises from the blowout that occurred as the mobile offshore drilling unit ("MODU") *Deepwater Horizon* was performing temporary abandonment procedures on the Macondo Well on April 20, 2010, catching the rig on fire and causing the rig to sink on April 22, 2010. The well blowout, explosion and sinking of the *Deepwater Horizon* resulted in the unauthorized discharge of oil, gas and other pollutants from the wellhead, through *Deepwater Horizon's* blowout preventer (BOP), lower marine riser package (LMRP) and a riser pipe, all of

which were connected to the Macondo Well, into the Gulf of Mexico and ultimately into and upon the waters and coastline of the State of Louisiana (hereinafter referred to as the "Incident"). The oil spill is the largest marine oil spill in history with an approximate release of 4.9 million barrels of oil, methane gas and other pollutants.

2.

The oil, gas and other pollutants discharged from the Macondo Well and from *Deepwater Horizon* and its equipment (hereinafter referred to as the "Gulf Oil Spill") invaded Louisiana's waters and adjoining coastline, severely damaging Louisiana's natural resources such as wetlands, shorelines, habitat, and wildlife, endangering the health, safety and welfare of the citizens of Louisiana.  These impacts continue.  Louisiana has been, and will continue to be, profoundly impacted by the *Deepwater Horizon* disaster and has incurred, and will continue to incur, significant costs and damages.

3.

The State of Louisiana files this civil action seeking declaratory relief as to certain Defendants' unlimited, joint and several liability and responsibility for all removal costs and damages to the State of Louisiana under the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.,* ("OPA") and the Louisiana Oil Spill Prevention and Response Act, La. R.S. 30:2452 *et seq*. ("OSPRA").

4.

The Defendants against which the State of Louisiana seeks declaratory judgment under OPA and OSPRA are BP Exploration & Production Inc., BP Corporation North America, Inc., BP America, Inc., BP p.l.c. (unless stated otherwise, collectively referred to as "BP"), Anadarko Exploration & Production LP ("Anadarko Exploration"), Anadarko Petroleum Corporation ("Anadarko Petroleum") (Anadarko Exploration and Anadarko Petroleum, unless stated otherwise,

collectively shall be referred to as the "Anadarko Defendants" or "Anadarko"), and MOEX Offshore 2007 LLC ("MOEX").

5.

The State of Louisiana also asserts claims against all Defendants herein for civil penalties and costs under the Louisiana Environmental Quality Act, La. R.S. 30:2001 *et seq*., for the unauthorized discharge of vast quantities of oil, gas and other pollutants which entered the waters of the State of Louisiana and adjoining coastline of Louisiana as a result of the Gulf Oil Spill beginning on or about April 20, 2010 and continuing through the present and into the future.

## PARTIES

6.

The State of Louisiana is a sovereign state of the United States.  Louisiana brings this action on its own behalf to protect the State's economic and environmental resources and revenue, and as *parens patriae* on behalf of the citizens of Louisiana who have been, and will continue to be, impacted by the Gulf Oil Spill.  Louisiana has standing, as *parens patriae,* to seek relief from impacts of the Defendants' acts and omissions upon the State as well as Louisiana's citizens.

7.

Under OPA and OSPRA, the Louisiana Oil Spill Coordinator's Office ("LOSCO"), along with other State Natural Resource Trustees, are authorized to undertake a process for assessing, pursuing and resolving natural resource damages resulting from an oil spill.  33 U.S.C. § 2706; La. R.S. 30:2480.  The State Natural Resource Trustees are the Louisiana Department of Environmental Quality ("LDEQ"), the Louisiana Department of Wildlife and Fisheries ("LDWF"), the Louisiana Department of Natural Resources ("LDNR") and "other agencies of the state of Louisiana designated by the governor according to the Oil Pollution Act of 1990 as state natural resource

trustees."  LAC 43:XXIX.101(A).  By letter dated May 20, 2010, from Governor Bobby Jindal to President Barack Obama, Governor Jindal appointed the Louisiana Coastal Protection and Restoration Authority ("CPRA") as the lead trustee agency for the purposes of the Gulf Oil Spill. (*See* Exhibit A: Letter from Governor Bobby Jindal to President Barack Obama, May 20, 2010). That letter also designated LOSCO as lead administrative trustee and LDEQ, LDWF and LDNR as additional trustees.  LOSCO, CPRA, LDEQ, LDWF and LDNR are collectively referred to herein as the "State Trustees."

8.

The State of Louisiana and the State Trustees, through the Louisiana Attorney General, are authorized and obligated to take affirmative action in order to protect those resources that are held in trust for the benefit of the citizens of Louisiana.  The claims for declaratory relief sought herein against Defendants are asserted so that the State may properly and adequately protect, assess and recover for those public resources injured by Defendants, as well as for any other damages allowed pursuant to OPA.

9.

BP Exploration & Production, Inc. ("BP E&P") is a foreign corporation organized and existing under the laws of the State of Delaware and is licensed to and is doing business in the State of Louisiana.  BP E&P conducts its deepwater drilling and completion operations through its Gulf of Mexico Strategic Performance Unit ("GoM SPU").

10.

BP Corporation North America, Inc. is a foreign corporation domiciled in the State of Indiana, with its principal place of business in the State of Illinois, and which is licensed to do business and doing business in the State of Louisiana and this District.

4

11.

BP America, Inc. is a Delaware corporation with its principal place of business in the State of Illinois and is licensed to do business and is doing business in the State of Louisiana and this District.  BP America, Inc. is the direct parent company of BP Exploration & Production, Inc.

12.

BP p.l.c. is a foreign corporation with its principal place of business in London, England, and is doing business in the State of Louisiana and this District.  BP p.l.c. has conducted continuous and systematic activities within the United States and this District for at least the last ten years, directly and through its wholly owned and controlled subsidiaries.  Those activities are partly responsible for the cause of the Incident as described herein.  It was reasonably foreseeable that BP p.l.c.'s activities would lead to the possibility of being sued in this District.

13.

Anadarko E&P Company, LP is a foreign business organized and existing under the laws of the State of Delaware and is doing business in the State of Louisiana and in this District.

14.

Anadarko Petroleum Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas and is doing business in the State of Louisiana and in this District.

15.

MOEX Offshore 2007, LLC is a foreign business organized and existing under the laws of the State of Delaware and is doing business in the State of Louisiana and in this District.

16.

Transocean Holdings LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

17.

Triton Asset Leasing GmbH is a limited liability company organized and existing under the laws of the Swiss Confederation, with its principal office in Zug, Switzerland, and is doing business in the State of Louisiana and in this District.  Triton Asset Leasing GmbH has conducted continuous and systematic activities within the United States and this District for at least the last ten years. Those activities are partly responsible for the cause of the Incident as described herein.

18.

Transocean Deepwater, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

19.

Transocean Offshore Deepwater Drilling, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

**JURISDICTION AND VENUE**

20.

Jurisdiction is proper in this Court under 33 U.S.C. § 2717(b), which grants the United States District Courts exclusive original jurisdiction over all controversies arising under the Oil Pollution Act, without regard to the citizenship of the parties or the amount in controversy, and

33 U.S.C. § 2717(f)(2) which authorizes this Court to enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover removal costs or damages.  28 U.S.C. § 2201 further grants this Court the authority to declare the rights of the parties hereto.

21.

The Court has supplemental jurisdiction over the State's civil penalty claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to other claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  The Court also has jurisdiction over the United States' civil penalty claims brought in this MDL. (*See* Complaint of the United States, Rec Doc. 1 in 10-cv-04536)

22.

Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391 (a)(2) and La. R.S. 30:2025 because a substantial part of the events or omissions giving rise  to the State's claims occurred in this District and substantial damage occurred in that part of the State encompassing this District.

## FACTUAL ALLEGATIONS

### The Defendants

23.

BP E&P  is the holder of Lease No. OCS-G 32306 granted by the United States Minerals Management Service (MMS)[1] through Lease Sale #206 for Mississippi Canyon Block 252 (the "Lease").  The Lease became effective on June 1, 2008.  This Lease allowed the Defendants to

---

[1] Secretary of Interior Ken Salazar changed the name of the Mineral Management Service on June 21, 2010, to the Bureau of Ocean Energy Management Regulation & Enforcement.

drill for oil and perform oil production-related operations at the Macondo Prospect.   BP Corporation North America, Inc. was registered with MMS as the financial guarantor for BP E&P.

24.

Pursuant to a series of agreements, including an Assignment of Record Title Interest in Federal OCS Oil and Gas Lease, and as evidenced by the Macondo Prospect Offshore Deepwater Operating Agreement, or Joint Operating Agreement ("JOA"), filed with and approved by MMS, BP E&P maintained a 65% ownership and operation stake in the Lease, or "Macondo Prospect," and assigned ownership stakes of 25% to Anadarko and 10% to MOEX.   BP E&P is the designated "operator and local agent (designated operator) with full authority to act in the lessee's behalf in complying with the terms of the lease and applicable regulations" pursuant to a "Designation of Operator" for the Macondo Prospect.

25.

On or about May 22, 2009, the MMS approved BP E&P's application for permit to drill (APD) exploratory well No. 1 on the Macondo Prospect: the "Macondo Well".

26.

On or around October 2009, the Defendants began drilling the Macondo Well using the *Transocean Marianas* which was owned by Triton Asset Leasing GMBH, Transocean Holdings, LLC, and/or Transocean Offshore Deepwater Drilling Inc. (collectively referred to herein as "Transocean" or the "Transocean Defendants") and operated pursuant to one or more contractual agreements between BP E&P and Transocean.

27.

On or around February 2010, the MODU *Deepwater Horizon*, a dynamically positioned, semi-submersible drilling rig owned and operated by the Transocean Defendants, replaced the *Transocean Marianas* and the exploratory drilling operations of the Macondo Well continued through April 9, 2010. Immediately thereafter, procedures for the temporary abandonment of the Macondo Well were begun, and were in progress at the time of the Incident.

28.

The *Deepwater Horizon* rig included various pieces of operating equipment such as sub-sea equipment and appurtenances, including, but not limited to, a blowout preventer ("BOP"), a lower marine riser package ("LMRP"), and a marine riser and associated piping ("riser pipe"). All of this equipment was attached to the wellhead, and was part of the facility at the time of the Incident.

## BP p.l.c. –Single Business Enterprise

29.

BP p.l.c. is a global energy company operating in eighty countries, with its headquarters in London, England.  Although BP has a myriad of corporate subsidiaries, in reality it operates itself as a single business enterprise, through "groups" organized by industry segments.  These include Exploration & Production, Refining & Marketing, and Alternative Energy.  Each group includes a large number of corporate subsidiaries around the world, and some corporate subsidiaries' activities are included in more than one group.

30.

In all substantive respects, the corporate structure of BP's subsidiaries is disregarded.  BP p.l.c. directs and controls the overall operations of its subsidiaries through its group management

structure.  For example, BP p.l.c. implemented a corporate-wide operating management system ("OMS") which, according to BP, "provides a single framework for all BP operations to follow, covering all areas from process safety, to personal health, to environmental performance."  BP also creates Group Practices ("GP") or Group Defined Practices ("GDP") and Engineering Technical Practices (ETP), which require detailed operations and procedures across all BP entities.  For example, the Exploration & Production group has issued GPs for Well Operations, Zonal Isolation, Working with Pressure, and Well Control.

31.

BP E&P is part of BP p.l.c.'s Exploration & Production group.  As such, all of its drilling and completion operations were directed and controlled by BP p.l.c. through, among other things the OMS, and the issuance of GPs, GDPs and ETPs.

32.

Upon information and belief: (1) the corporate chain of ownership of BP E&P, through BP America, Inc. and other entities up to BP p.l.c. gives BP p.l.c. actual working control of these subsidiaries; (2) BP E&P, BP America, Inc. and BP p.l.c. share common directors or officers and/or have promoted officers of these subsidiaries to officer and/or director positions at BP p.l.c.; (3) BP p.l.c. exercises unified administrative control of its subsidiaries, including BP E&P and BP America, Inc., through groups whose business functions are similar or supplementary; (4) the directors and officers of BP E&P and BP America, Inc. act independently in the interest of BP p.l.c.; (5) BP p.l.c. finances BP E&P and BP America, Inc.; (6) BP p.l.c. (or its predecessor in name) caused the incorporation of BP E&P and BP America, Inc.; (7) BP E&P, BP America, Inc. and BP p.l.c. use each other's property, services, and personnel as their own; (8) BP E&P and BP America, Inc. and BP p.l.c. share common employees; (10) BP E&P, BP

10

America, Inc. and BP p.l.c. render services to each other by the employees of one corporation on behalf of the other corporation; (11) BP E&P, BP America, Inc. and BP p.l.c. share common offices; (12) BP E&P, BP America, Inc. and BP p.l.c. share centralized accounting; (13) BP E&P, BP America, Inc. and BP p.l.c. file consolidated U.S. income tax returns; and (14) there is excessive fragmentation of a single enterprise into separate corporations.

### The Defendants' Wrongful Conduct

33.

The Incident and the resulting unauthorized discharge of oil, gas and other pollutants into the waters and onto the land of Louisiana were caused by the acts, omissions, fault, negligence, gross negligence, reckless, willful and wanton behavior, and/or breach of federal and state law and regulations, by the Defendants, which renders them liable jointly and severally to Louisiana for all of its damages as set forth below.

34.

The Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Louisiana's marine and coastal environments and estuarine areas, and the State's Coastal Zone.

35.

The Macondo Well was difficult to drill, especially in light of its location in 5,000 feet of water. Before April 20, 2010, the well had experienced several lost circulation events and kicks. One such event on March 8, 2010 nearly resulted in a catastrophic blowout of the well. As the drilling went deeper, the tolerance between pore pressure and fracture gradient became extremely tight, increasing the risk of a blowout. All Defendants knew, or should have known, of these problems and should have taken precautions to prevent the Incident.

36.

The Defendants failed to observe and/or comply with federal regulations and/or industry standards including, but not limited to, federal regulations and/or industry standards regarding the design, installation, maintenance, surveillance, repair, observation and operation of drilling equipment and/or operations.  These regulations and industry standards include 30 C.F.R. § 250 *et seq.*, as well as American Petroleum Institute (API) recommended practices including API RP 65 and API RP 75.

37.

At the time of the Incident, the Macondo Well was months behind schedule and significantly over budget. Defendants made and/or authorized a number of reckless decisions concerning well design, cementing, and integrity testing in the interest of speed and cost savings, at the expense of safety and industry best practices.

38.

BP E&P's casing design for the Macondo Well was flawed.  Before the Incident BP E&P knew that the casing used in the Macondo Well might collapse under the high pressures encountered in the well. Just a few weeks before the Incident, BP E&P changed the original casing design to use a "long string" casing for the final casing string rather than a "liner/tieback" design, which would have provided more barriers against a well blowout. BP E&P knew that the long string design was a risky option for the Macondo Well, given the problems that had already been encountered with the well.

39.

Before cementing the well for temporary abandonment, BP E&P elected to use only six centralizers (which are used to center the casing in the well to avoid cement channeling), despite notice from Halliburton, the cement contractor, that using less than 21 centralizers could cause a severe gas flow problem.

40.

In order to save time, BP E&P decided to forego a "bottoms up" circulation of drilling mud before cementing the well.  This would have allowed for testing the mud for gas influx, release of gas pockets, and removal of debris from the bottom of the well so that the cement would not become contaminated. A "bottoms up" circulation likely would have indicated the gas flow problem that caused the Incident in time to prevent it.

41.

Because of the tight downhole pressure conditions of the Macondo Well, Halliburton recommended the use of nitrified foam cement slurry to seal the formations in the well.  BP E&P knew, or should have known, that Halliburton's foam cement slurry design would be unstable and could cause nitrogen breakout. Nevertheless, BP E&P decided to use the cement slurry before receiving the lab tests which would have indicated the instability.  Given the instability of the cement slurry design, BP E&P should have mixed fluid loss additives in the slurry mix to prevent formation losses, but did not do so.

42.

As part of the cementing process, BP E&P used an improper base oil spacer mix just ahead and behind the cement slurry that, coupled with the small volume of cement used, may have contaminated the cement slurry.  BP E&P knew, or should have known, that the cement design and implementation had a very low probability of ever becoming an effective barrier to well flow.

43.

The spacer used in the cement job was a combination of Forma-set and Form-a-squeeze loss containment material (LCM) pills. This was leftover material that government regulations prohibited from discharge directly into the Gulf.  However, if these materials are circulated in the well, a loophole in the regulations allowed them to be dumped overboard.  BP E&P intentionally

used these materials as a spacer in order to save the cost of having to transport them to shore and properly dispose of them, all the while knowing that they were not designed for that application and that cement contamination could result.

44.

After the cement job, BP E&P and Transocean ran a negative pressure test, designed to test the integrity of the cement. The negative pressure test was abnormal.  Transocean personnel advised the well site leader that the abnormal readings were due to the "bladder effect" and that the test results were normal.  The "bladder effect" is an unknown phenomenon and both BP E&P and Transocean had actual and/or constructive knowledge before the Incident that a negative pressure test indicated that the cement had failed to seal the hydrocarbon-bearing formation. Nevertheless, BP E&P and Transocean elected to ignore the abnormal test results without shutting in the well.

45.

BP E&P had a Schlumberger team on the rig to perform a cement bond log (CBL) to test the integrity of the cement.  In spite of the abnormal negative pressure test results, BP E&P sent the Schlumberger team home without doing the CBL.  MMS regulations (30 CFR 250.428) require the running of a CBL when there is an indication of an inadequate cement job, such as the abnormal negative pressure test.  The cement bond log test would have conclusively determined the integrity of the cement job, and BP E&P knew that it should have been performed and elected to violate Federal regulations requiring it.

46.

As part of its casing design and well plan, BP E&P decided not to deploy the long string casing hanger lockdown sleeve for the long string casing before cementing the well.  This lockdown sleeve would have locked the top of the long string casing at the wellhead, thereby providing an extra layer of protection against a blowout. The long string wellhead seal at some

point was likely lifted out of place by pressure from below, resulting in a flow path for hydrocarbons to escape into the Gulf of Mexico.

47.

As long as the BOP, LMRP and Marine Riser are attached to the wellhead, a conduit directly to the rig exists through which well data will be obtained in real time.   As long as a direct conduit from the well to the rig exists, constant monitoring to ensure well control is maintained is required.  Transocean is responsible, regardless of the other operations that were occurring, for ensuring that well control is maintained at all times.  In the critical hours before the blowout, Transocean and BP E&P decided to offload drilling mud to a waiting vessel, which caused rig workers to become distracted and fail to properly monitor well conditions. Additionally, the mud offloading process prohibited certain rig workers from monitoring the Sperry Sun data.  The mud offloading should have been delayed until after the well was finally secured.

48.

Warning signs of well flow were being transmitted to the rig, to Halliburton's Houston office and BP E&P's Houston office in real time for almost an hour before hydrocarbons reached the rig, alerting rig workers to shut down the well.  Nevertheless, the rig workers apparently ignored these warning signs until it was too late. Moreover, during that critical hour before the well blowout, there was no one at the Halliburton or BP E&P offices to monitor this data and issue the appropriate warnings.  This data was also available on any BP E&P employee's laptop computer yet none of them were monitoring that data.

49.

When drilling mud started gushing onto the rig floor, the vessel crew diverted the flow from the well into the mud-gas separator (MGS), a device used to separate gas out of the drilling fluid and vent it safely into the air in the event of a kick.  The MGS vent was designed

for small gas releases and the massive amount of gas flowing through it vented down onto the deck of the rig, causing the explosion and fire on the rig. Another larger alternative diverter pipe was available, which would have vented the gas overboard, making it less likely to have ignited. The rig crew should have employed that option, but failed to do so.

50.

On information and belief, the initial explosion on the *Deepwater Horizon* on the night of April 20, 2010, was caused when an engine in the rig's engine room sucked in the gas vapors from the MGS vent pipe, causing the engine to overspeed.  Gas sensors designed to help avoid explosions by shutting down these engines and closing air intake manifolds when flammable gas is present were not operational on the night of the Incident.  Gas alarms which would have alerted the crew to shut down the rig had been intentionally disarmed.

51.

The rig's Emergency Disconnect System (EDS), which was designed to separate the vessel from the Marine Riser in case of an emergency, failed to activate, allowing gas to continue flowing through the riser and fueling the fire on the *Deepwater Horizon,* resulting in her sinking two days later.

52.

MMS regulations and industry standards required a blowout preventer as the last line of defense to a well blowout.  The regulations and industry standards mandated a minimum configuration of annular preventers and blind sheer rams to shut off the well in the event of a blowout.  They also required backup systems and controls, as well as periodic maintenance, to ensure that the BOP functioned when necessary.

53.

The *Deepwater Horizon's* BOP and its control systems were not properly configured, improper modifications were made to them, and they were not properly functioning at the time of

the Incident.  In addition, required inspections and maintenance on the BOP was not performed. Rig audits of the *Deepwater Horizon* in September 2009 and April 2010 placed BP E&P and Transocean on notice of these deficiencies, yet these Defendants did nothing to correct them in time to prevent the Incident.

54.

In 2000, a chemical plant in Grangemouth, Scotland, owned and operated by a BP p.l.c. subsidiary had a number of chemical releases and fires.  A subsequent investigation by the U.K. authorities attributed the accidents to systemic failures in BP's safety management system.  In 2005, a catastrophic explosion occurred at the Texas City, Texas refinery owned and operated by BP America, Inc.  An independent report by the Baker Commission cited BP for systemic failures in its safety management systems.  In 2006, an oil pipeline leak occurred in Alaska at a BP America, Inc. facility.  Once again, an independent report by Booz, Allen, Hamilton cited BP for systemic failures in its safety management systems.

55.

After each of the foregoing events, BP p.l.c. announced that it was enacting sweeping reforms to its safety management systems.  As each succeeding incident occurred, these alleged reforms did not prevent the next disaster.

56.

The latest iteration of BP p.l.c.'s safety management system is called the Operating Management System (OMS).  BP p.l.c. intended to implement its OMS in all of its divisions or groups, including the GoM SPU division of BP E&P, before the design and drilling of the Macondo Well.  The OMS included implementation of Group Defined Practices which affected the design and operation of the Macondo Well.

57.

A critical element of BP's OMS is the concept of continuous improvement of procedures and practices. As stated by BP p.l.c. "Our performance improvement cycle is at the heart of OMS, driving and sustaining change and improvement in local business processes. It incorporates the concept of continuous improvement (CI), which provides the tools and frame of mind needed to engage the entire organization in tackling challenges and ensuring that problems are eliminated and operations run at maximum efficiency."

58.

After the *Deepwater Horizon* disaster, BP E&P conducted an internal investigation of the causes of the Incident. The investigation specifically did not address systemic problems as potential causes of the Incident. Nevertheless, recommendations by the investigative report indicated significant failures in BP E&P's OMS before the Incident. Had OMS been properly implemented by BP p.l.c. at BP E&P, the problems pointed out in the recommendations of the investigative report should have been addressed and cured before the design and drilling of the Macondo Well, and the Incident would have been less likely to occur.

59.

BP p.l.c.'s OMS contained inherent weaknesses which did not ensure an adequate safety management system. BP p.l.c. took on the obligation to implement OMS across its subsidiaries, but did not insure that they properly did so. The inherent weaknesses in BP p.l.c.'s OMS and the failure to properly implement and supervise the OMS contributed, in part, to the cause of the Incident.

60.

The GoM SPU's OMS document created a detailed Central Team Model responsible for well design and management centered around two core groups: Engineering and Operations. However, just months before the Incident, the GoM SPU rearranged its management structure.

This led to confusion in critical decisions made affecting the management of the Macondo Well which resulted, in part, in the Incident.

61.

According to BP E&P it gave or made available to its co-owners, Anadarko and MOEX, documents that showed the well design and changes to the well design.  BP E&P also identified major well control events encountered during drilling operations and personnel from the co-owners engaged in periodic communications with BP about well design and other issues related to the well.

62.

On information and belief, Anadarko and MOEX were aware of design choices for the well, including the decision to use a so-called "long string casing", and how many centralizers were being used to stabilize the long string, rather than the safer alternative of hanging a liner to the lower end of the casing with a "tieback."

63.

The operating agreement among BP E&P, Anadarko and MOEX: (1) required that copies of all APDs, IADC daily reports, core data, logs, surveys, all digitally recorded data, well test results, bottomhole pressure surveys, hydrocarbon analyses, drilling prognoses, and forty-eight (48) hours' advance notice of logging, coring, or testing operations be provided to Anadarko and MOEX; (2) gave Anadarko and MOEX the right to request copies of any HSE audits conducted of the drilling operations on the subject well; (3) gave Anadarko and MOEX the right of access to activities and operations and access to Operator's HSE files as provided for in this Operating Agreement; (4)  gave Anadarko and MOEX the right to request the Operator to present to the Non-Operators, at a meeting called in accordance with the Operating Agreement, a sufficient overview of its Health, Safety and Environmental Management systems to evidence compliance with an effective Health, Safety & Environmental Management Plan or Plans, in accordance with

API RP75, or an equivalent standard, including Operator's internal policies, for all operations conducted under the Operating Agreement; (5) required Anadarko and MOEX to give cooperation and support to the Operator to:

    a)  design and manage activities or operations to standards intended to achieve sustained reliability and promote the effective management of HSE risks;

    b)  apply structured HSE management systems and procedures consistent with those generally applied in the petroleum industry to effectively manage HSE risks and pursue sustained reliability of operations under this Agreement; and

    c)  conform with locally applicable HSE related statutory requirements that may apply.

64.

The foregoing contractual rights and obligations placed Anadarko and MOEX in the position of being able to oversee all of the operations at the Macondo Well and to intervene to prevent the Incident from occurring.  Anadarko and MOEX failed to properly exercise their rights or obligations under the operating agreement which caused, in part, the Incident.

65.

Prior to the Incident, all Defendants had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon's* equipment, its maintenance, and the negligent design and operation of the Macondo Well.

66.

One or more of the foregoing actions or inactions constitute violations of federal regulations, particularly 30 C.F.R. § 250, *et seq.*

67.

The Defendants' failure to observe and/or comply with federal regulations and/or industry standards include, but is not limited to, federal regulations and/or industry standards

regarding the design, installation, maintenance, surveillance, repair, observation and operation of the Defendants' equipment and/or drilling operations.

## **The Disaster and its Impact on Louisiana**

68.

BP initially reported a leak of approximately 1,000 barrels a day on April 24, 2010. However, this figure was grossly underestimated and was replaced by exponentially growing figures on a repeated basis. Ultimately, after analysis of video footage of the oil leak, a government panel determined that the oil was flowing out of the well at a rate of at least 20,000 to 40,000 barrels a day, or 1.7 to 2.5 million gallons a day.

69.

Louisiana Governor Bobby Jindal declared a state of emergency on April 29, 2010, requesting additional resources from the federal government to assist the State in preparations for the impacts of the *Deepwater Horizon* disaster. Governor Jindal's declaration was based upon the "predicted impact of oil along the Louisiana coast leaking from the *Deepwater Horizon* which threatens the state's natural resources, including land, water, fish, wildlife, fowl and other biota, and likewise threatens the livelihoods of Louisiana's citizens living along the coast which increases the economic impact of this incident."

70.

Repeated efforts to curtail or stop the flow of oil leaking from the Macondo Well failed until approximately 87 days after the initial explosion, with an estimated discharge of 4.9 million barrels making this the largest oil spill in history.

71.

On or around April 30, 2010, oil began washing up on the shoreline of Venice, Louisiana and nearby beaches.   On May 6, 2010, federal, state and BP officials confirmed that oil was found on the beach at Chandeleur Islands, a small group of uninhabited barrier islands northeast of the Mississippi Delta.

72.

On May 31, 2010, the Secretary of the LDEQ issued to BP Exploration and Production, Inc. a Consolidated Compliance Order and Notice of Potential Penalty, which ordered BP to immediately take any and all measures necessary to eliminate the unauthorized discharge of oil and other pollutants into waters and property located in the State of Louisiana, and to remediate all oil contaminated media to the extent practicable.  Similar compliance orders were issued to the Transocean defendants on October 12, 2010.

73.

Oil, gas and other pollutants from the spill have, in one or more forms, invaded, and continue to invade, Louisiana's reedy freshwater, brackish and saline wetlands, and continue to impact new areas of Louisiana coastline.   Louisiana's marshes, wetlands, shores, ecology, economy, tourism, fisheries, waters, and wildlife have been and will continue to be profoundly impacted by the *Deepwater Horizon* disaster.   Southern Louisiana has 40% of the nation's coastal wetlands. These wetlands provide a range of goods and services, including flood control, water purification, storm buffer, wildlife habitat, nursery grounds for aquatic life, and recreational areas.   Hundreds of miles of shoreline have been impacted by the oil spill. Additional impacts will continue as the oil washes ashore and further saturates the wetlands it has reached.

74.

In response to the spill, Louisiana closed a considerable amount of fishing areas within its territorial waters, which has further impacted the approximately 27,000 Louisianans employed by the seafood industry.  Louisiana's shellfish industry has been especially damaged, as the State has been forced to close oyster beds along over one hundred miles of coastline.  At considerable expense, Louisiana continually samples oysters from open beds - along with other seafood - to ensure that the public is protected.

75.

In addition to Louisiana's fishery closures, the National Oceanic and Atmospheric Administration (NOAA) began prohibiting all commercial and recreational fishing, including catch and release, in federal waters between the mouth of the Mississippi River to waters off Florida's Pensacola Bay on May 2, 2010.  As the oil continued to spread, NOAA expanded the area closed to fishing on a regular basis.

76.

Louisiana has a $3 billion fishing industry and is the source of a third of the seafood consumed in the United States, according to the Louisiana Seafood Marketing and Promotion Board, a state-run agency.   The negative impact of this spill on Louisiana fishermen, processors, charter boat operators, home ports and supporting infrastructure, such as cold storage, marinas, boatyards, suppliers, repair yards and transportation businesses, will be long-lasting and profound.

77.

Other natural resources have been injured or destroyed as a result of this spill, including birds, sea turtles, and marine mammals, as well as the waters of the Gulf of Mexico and the State

of Louisiana, including the biota, benthic communities, marine organisms, coral, fish, and water-column habitat.

78.

The State of Louisiana has suffered, and will continue to suffer, extensive damage to its natural resources as well as to its real and personal property, loss of subsistence use of its natural resources, loss of taxes, rents, royalties and fees due to the injury to, loss or destruction of its real property, personal property and natural resources.  Further, Louisiana, through its agencies, has incurred substantial costs in responding to this disaster and providing increased and additional public services.

79.

The State of Louisiana has incurred substantial removal and response costs.  Pursuant to 33 U.S.C. § 2701(30), "removal activities" include not only removal of oil from water and shorelines, but also "the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including but not limited to fish, shellfish, wildlife, and public and private property, shorelines and beaches."  *See also*, La. R.S. 30:2454(25)(identifying removal costs).

80.

The State of Louisiana has sustained, and will continue to sustain, "removal costs" and "damages" as defined by the OPA and OSPRA.

## CLAIM FOR RELIEF

### COUNT I

### Against BP, Anadarko and MOEX Defendants

### Declaratory Judgment That Defendants Are Jointly, Strictly and Severally Liable For Costs and Damages under OPA

81.

Paragraphs 1 through 80 are realleged and incorporated herein by reference.

82.

This Count is alleged against the BP, Anadarko and MOEX entities identified as Defendants herein in paragraphs 9 through 15 above.

83.

The Declaratory Judgment Act allows a federal court to declare the rights and other legal relations of any interested party seeking such declaration in an actual controversy within its jurisdiction.  28 U.S.C. § 2201.

84.

The facts and circumstances alleged herein present an actual and existing controversy between the BP, Anadarko and MOEX Defendants and the Plaintiff.

85.

OPA, 33 U.S.C. § 2701 *et seq.*, as enacted in 1990, establishes a strict liability scheme which holds responsible parties strictly liable for damages and removal costs related to oil spills. OPA also provides that each responsible party for a vessel or facility from which oil is discharged "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages . . . that result from such incident."  33 U.S.C. § 2702(a).

86.

Responsible parties for an offshore facility include the lessee or permittee of the area in which the facility is located or the holder of a right to use and easement granted under applicable state law or the Outer Continental Shelf Lands Act, 43 U.S.C. § 1301 *et seq.*, for the area in which the facility is located.  Responsible parties also include any person owning, operating, or

demise chartering the vessel. 33 U.S.C. § 2701(32).

87.

As a result of the various contractual and other agreements alleged and identified herein, and the corporate relationships among the parties, the BP, Anadarko and MOEX Defendants are responsible parties within the meaning of OPA, and are jointly and severally responsible to the State of Louisiana for removal costs and damages, as defined in 33 U.S.C. § 2702(b)(2), including (1) all removal costs; (2) damages to natural resources; (3) damages to real or personal property; (4) subsistence use of natural resources; (5) net loss of revenues to a state or political subdivision thereof; (6) lost profits and earning capacity; and (7) damages for net costs of providing increased or additional public services during or after removal activities.

88.

Louisiana has incurred, and will continue to incur, removal costs related to the unauthorized discharge or threat of discharge of oil, gas and other pollutants and the costs related to preventing, mitigating, and minimizing oil pollution which has impaired or threatens to impair Louisiana's waters, coast line, and natural resources.

89.

The BP, Anadarko and MOEX Defendants are strictly liable for damages to natural resources belonging to, held in trust by, managed by, controlled by or appertaining to the State of Louisiana.  33 U.S.C. § 2706(a)(2).  Natural resources are broadly defined and include "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by…any State."  33 U.S.C. § 2701(20).  The measure of natural resource damages is the cost of restoring, rehabilitating, replacing or acquiring the equivalent of the damaged natural resources; the diminution in value of

those natural resources pending restoration; plus the reasonable costs of assessing those damages. 33 U.S.C. § 2706(d)(1).

90.

The BP, Anadarko and MOEX Defendants are strictly liable to Louisiana for damages associated with injury to, or economic losses resulting from the destruction of real or personal property owned or leased by the State.  33 U.S.C. § 2702(b)(2)(B).

91.

The BP, Anadarko and MOEX Defendants are strictly liable to Louisiana for lost revenues associated with the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property or natural resources.  33 U.S.C. § 2702(b)(2)(D).

92.

The BP, Anadarko and MOEX Defendants are strictly liable to Louisiana for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards caused by the discharge of oil.  33 U.S.C. § 2702(b)(2)(F).

93.

The actions and inactions of the BP, Anadarko and MOEX Defendants, as described above constitute gross negligence and/or willfull misconduct and/or constitute violations of Federal safety, construction or operating regulations.  Therefore, the BP, Anadarko and MOEX Defendants' liability pursuant to OPA is unlimited pursuant to 33 U.S.C. § 2704 (c)(1)(A) and 33 U.S.C. § 2704 (c)(1)(B).

94.

Plaintiff requests that this Court enter a Declaratory Judgment finding that the BP, Anadarko and MOEX Defendants have unlimited joint, several and strict liability under OPA for the State of Louisiana's removal costs and damages resulting from the *Deepwater Horizon* disaster, and that Plaintiff is entitled to relief as set forth above, and such further relief as may be deemed appropriate pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202, *et seq*.

95.

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and Rule 57 of the Federal Rules of Civil Procedure, as well as OPA, 33 U.S.C. § 2717(f)(2), Plaintiff seeks a judicial declaration, which shall be binding on subsequent actions by Plaintiff to recover damages and removal costs, that the BP, Anadarko and MOEX Defendants are responsible parties under OPA, 33 U.S.C. § 2701 *et seq*. and are liable for all removal costs and damages arising out of the *Deepwater Horizon* disaster.

## COUNT II

### Against BP, Anadarko and MOEX Defendants

### Declaratory Judgment That Defendants Are Jointly, Strictly and Severally Liable For Costs and Damages under OSPRA

96.

Paragraphs 1 through 95 are realleged and incorporated herein by reference.

97.

This Count is alleged against the BP, Anadarko and MOEX entities identified as Defendants herein in paragraphs 9 through 15 above.

98.

The Declaratory Judgment Act allows a federal court to declare the rights and other legal relations of any interested party seeking such declaration in an actual controversy within its jurisdiction.  28 U.S.C. § 2201.

99.

This suit is ripe for adjudication as there exists a real controversy between the State of Louisiana, which has been damaged because of the oil spill, and the BP, Anadarko and MOEX Defendants.

100.

Louisiana has suffered significant injury to its natural resources and has incurred and will continue to incur costs related to removal of the oil as well as economic damages associated with the disaster.

101.

OPA does not preempt states from imposing additional requirements or liability for the discharge of oil.  33 U.S.C. §§ 2718(a)(1) and 2718(c)(1).

102.

The Louisiana Legislature recognized Louisiana's unique exposure to oil spills when it enacted OSPRA, La. R.S. 30:2451, *et seq.*; La. R.S. 30:2452(A).   In passing OSPRA, the Legislature expressly recognized the constitutional duties of the State of Louisiana to "protect, conserve and replenish the natural resources of [Louisiana]." La. R.S. 30:2453(A) (*citing* La. Const. art. IX Sec. 1). Louisiana's constitutional duty of protecting the environment is based on the public trust doctrine which is recognized in the State Constitution. Article IX, Section 1 of the Louisiana Constitution provides:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

OSPRA applies "in the event that an unauthorized discharge of oil or the substantial threat of an unauthorized discharge of oil to state waters results in injury to natural resources." LAC 43:XXIX.101(A).

103.

Responsible parties under OSPRA include "[t]he owner or operator of a vessel or terminal facility from which an unauthorized discharge of oil emanates or threatens to emanate." La. R.S. 30:2454(22)(a). Responsible parties also include any person "who causes, allows, or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil."  La. R.S. 30:2454(22)(c).

104.

The BP, Anadarko and MOEX Defendants were each owners and/or operators of the Macondo Well and the *Deepwater Horizon* rig and as such are responsible parties under OSPRA. *See* La. R.S. 30:2454(20).

105.

Additionally the BP, Anadarko and MOEX Defendants each caused, allowed or permitted the unauthorized discharge of oil from the Macondo Well and *Deepwater Horizon* rig. As such, they are responsible parties under OSPRA.  *See* La. R.S. 30:2454(22)(c).

106.

OSPRA defines "discharge of oil" broadly to include "an intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters of the state or at any place where, unless controlled or removed, they may drain, seep, run, or otherwise enter coastal waters of the state."  La. R.S. 30:2454(7).

107.

Under the provisions of OSPRA, the BP, Anadarko and MOEX Defendants as responsible parties, are strictly, jointly, and severally liable for this oil spill.

108.

Plaintiff request that this Court enter a Declaratory Judgment finding that the BP, Anadarko and MOEX Defendants are jointly, severally and strictly liable under OSPRA for the State of Louisiana's removal costs and damages resulting from the *Deepwater Horizon* disaster, and that Plaintiff is entitled to relief as set forth above.

## COUNT III

### Against All Defendants

### Civil Penalties for Violations of the Louisiana Environmental Quality Act

109.

Paragraphs 1 through 108 are realleged and incorporated herein by reference.

110.

This Count is alleged against all Defendants identified herein.

111.

La. R.S. 30:2072 provides that the waters of the state of Louisiana are among the State's most important natural resources and their continued protection and safeguard is of vital concern to the citizens of this State.

112.

La. R.S. 30:2076(A)(1) prohibits the discharge into any waters of the State of any waste or any substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation.  La. R.S. 30:2076 (A)(3) prohibits the violation by an person of any rule or regulation adopted under the Louisiana Water Control Law, La. R.S. 30, Subtitle II, Chapter 4 or under authority of that Subtitle.

113.

Defendants caused and/or allowed the unauthorized discharge of oil, gas and other pollutants into the waters and onto the coastline of the State of Louisiana.  Defendants' unauthorized discharge of pollutants constitute continuing violations of La. R.S. 30:2075, La. R.S. 30:2076(A)(1)(a) and (A)(3) and LAC 33:IX.1701.B.

114.

La. R.S.  30:2025(E)(1)(a) authorizes the assessment of civil penalties against each Defendant of not more than thirty two thousand five hundred dollars ($32,500) for each day of violation of the Louisiana Environmental Quality Act. A penalty of up to $50,000 may be assessed against each Defendant for each day of violation of a compliance order issued by LDEQ.  La. R.S. 30:2025(E)(2).  However, when any such violation is done intentionally, willfully, or knowingly or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or

health, such person may be liable for an additional penalty or not more than one million dollars ($1,000,000) for each penalty event. La. R.S. 30:2025(E)(1)(a);  LAC 33:I.703;  LAC 33:I.705. For violations lasting more than one 24-hour day, each such day of violation may be treated as a separate penalty event.  LAC 33:I.703.A.

115.

The presence of oil, gas and other pollutants in Louisiana coastal waters continues to this day, and has caused severe damage to the environment, endangering human life and health, and is likely to continue to do so for an unspecified period of time, in violation of Louisiana law.

116.

As a result of Defendants violations, each Defendant is liable under La. R.S. 30:2025 for a civil penalty of not more than $32,500 for each day of violation ($50,000 for each day of violation of a compliance order issued by LDEQ),  and for an additional penalty of not more than $1,000,000.00 for each day of violation.

117.

The State of Louisiana further requests an award of costs incurred in this litigation, including attorney fees, to the extent recoverable under the Louisiana Environmental Quality Act.

**COUNT IV**

**Against All Defendants**

**Recovery of Response Action Costs**

118.

Paragraphs 1 through 117 are realleged and incorporated herein by reference.

119.

This Count is alleged against all Defendants identified herein.

120.

The State has incurred response action costs associated with the discharge.  Many of these costs have not been paid by Defendants to date.

121.

As of February 15, 2011, the State has incurred at least $ 342,612 in unpaid response costs.  The State will continue to incur response costs in the future.

122.

Pursuant to La. R.S. 30:2025, Defendants are liable to the State for response action costs the State incurs in responding to the discharge.

## RESERVATION OF RIGHTS

123.

The full extent of the costs expended and damages suffered by the State of Louisiana is not yet known.  The investigation of other potential claims and parties continues, as does the assessment of environmental and economic damages as well as the performance of removal activities.  The State of Louisiana reserves its right as provided by law, including but not limited to 33 U.S.C. § 2717(f)(2), to amend this Complaint and/or file subsequent complaints under OPA or any other theory of law, statutory or otherwise, to assert claims for removal costs, damages, penalties or any other legal and/or equitable remedies, against the Defendants named herein and/or any other additional parties.

## PRAYER FOR RELIEF

WHEREFORE, the State of Louisiana respectfully prays that this Court enter judgment

in its favor and against Defendants, and that the Court:

1. Enter an order declaring that the BP, Anadarko and MOEX Defendants are responsible parties pursuant to OPA and OSPRA, and are jointly, severally, and strictly liable, along with all other responsible parties, for unlimited removal costs and damages resulting from the *Deepwater Horizon* disaster pursuant to the Declaratory Judgment Act and Rule 57 of the Federal Rules of Civil Procedure.

2. Enter judgment against each Defendant and award the State of Louisiana civil penalties of not more than $32,500 for each day of violation, up to $50,000 for each day of violation of a compliance order and an additional penalty of not more than $1,000,000.00 for each day of violation with legal interest from the date of judicial demand until paid.

3. Enter judgment against all Defendants and award the State of Louisiana its unpaid response action costs in the amount of at least $ 342,612 with legal interest from the date of judicial demand until paid.

4. Enter judgment against all Defendants and in favor of the State of Louisiana, ordering Defendants to reimburse the State for all reasonable costs it may incur responding to the oil spill described herein.

5. Retain jurisdiction of this action to ensure compliance with its orders.

6. Award Plaintiff's costs incurred in pursuing this action, including attorney fees as allowed by law; and

7. Order such other and further relief as the Court may deem just and appropriate.

Dated this 3rd day of March, 2011.

Respectfully submitted,

| | |
|---|---|
| JAMES D. "BUDDY" CALDWELL<br>LOUISIANA ATTORNEY GENERAL | KANNER & WHITELEY, LLC |
| | /s/ Allan Kanner |
| James Trey Phillips | Allan Kanner |
| First Assistant Attorney General | Elizabeth B. Petersen |
| Megan K. Terrell | David A. Pote |
| Assistant Attorney General | 701 Camp Street |
| Section Chief –Environmental | New Orleans, LA 70130 |
| State of Louisiana | Telephone: (504) 524-5777 |
| P.O. Box 94005 | **Special Counsel for Plaintiff** |
| Baton Rouge, LA 70804-9005 | **Attorney General, State of Louisiana** |
| Telephone: (225) 326-6708 | |
| | |
| HENRY DART, | USRY, WEEKS, & |
| ATTORNEYS AT LAW P.C. | MATTHEWS, APLC |
| | |
| /s/ Henry T. Dart | /s/ T. Allen Usry |
| Henry T. Dart | T. Allen Usry |
| Grady J. Flattmann | 1615 Poydras St. |
| 510 N. Jefferson St. | Suite 12 |
| Covington, LA 70433 | New Orleans, LA 70112 |
| Telephone: (985) 809-8093 | Telephone: (504) 592-4641 |
| **Special Counsel for Plaintiff** | **Special Counsel for Plaintiff** |
| **Attorney General, State of Louisiana** | **Attorney General, State of Louisiana** |
| | |
| SHOWS, CALI, BERTHELOT & | MARTEN LAW FIRM, PLLC |
| WALSH, LLP | |
| | /s/ Bradley M. Marten |
| /s/ E. Wade Shows | Bradley M. Marten |
| E. Wade Shows | Linda R. Larson |
| 628 St. Louis Street | 1191 Second Avenue |
| Baton Rouge, LA 70802 | Suite 2200 |
| Telephone: (225) 346-1461 | Seattle, WA 98101 |
| **Special Counsel for Plaintiff** | (206) 292-2600 |
| **Attorney General, State of Louisiana** | **Special Counsel for Plaintiff** |
| | **Attorney General, State of Louisiana** |

**DEFENDANT WAIVER OF SERVICE SOUGHT:**

BP Exploration and Production
Through their Registered Agent
CT Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

BP Corporation North America Inc.
Through their Registered Agent
The Prentice-Hall Corp. System
320 Somerulos Street
Baton Rouge, LA 70802

BP America Inc
Through their Registered Agent
C T Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

BP p.l.c.
International Headquarters
1st James's Square
London
SW1Y 4PD

Anadarko Petroleum Corporation
Through their Registered Agent
C T Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

Anadarko E&P Company, LP
Through their Registered Agent
C T Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

MOEX Offshore 2007 LLC
9 Greenway Plaza, Suite 1220
Houston, TX 77046, USA

Transocean Holdings LLC
4 Greenway Plaza, Suite 700
Houston, TX 77046

Triton Asset Leasing GmbH
c/o Managing Director, Robert Bowden
Turmstrasse 30
Zug, ZG 6300 Switzerland, Europe

Transocean Deepwater, Inc.
4 Greenway Plaza
Houston, TX 77046

Transocean Offshore Deepwater Drilling
4 Greenway Plaza
Houston, TX 770406

[K&W 5694]